IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 13, 2018 Session

## KENNETH FULMER ET AL. v. JEFFREY FOLLIS ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-000785-14  Felicia Corbin Johnson, Judge**

_____

**No. W2017-02469-COA-R3-CV**

_____

Purchasers of real property brought this action against the sellers alleging fraud, fraudulent misrepresentation, fraudulent inducement, and fraudulent concealment. The alleged misrepresentations and concealment related to severe water damage to one wall of the purchased house.  The trial court found in favor of the purchasers with respect to each claim.  After our thorough review of the record, we conclude that because the purchasers were on notice of potential defects and failed to exercise ordinary diligence, the evidence preponderates against the trial court's finding that the purchasers reasonably relied on the sellers' misrepresentations and concealment.  We reverse and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded.**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Webb Alexander Brewer, Memphis, Tennessee, for the appellants, Jeffrey Follis, and Debra Follis.

Sam Blaiss, Memphis, Tennessee, for the appellees, Kenneth Fulmer, and Debra Fulmer.

## OPINION

### I. FACTS AND PROCEDURAL HISTORY

Kenneth and Debra Fulmer ("Purchasers") purchased a home from Jeffrey and Debra Follis ("Sellers"), which, unknown to Purchasers, had significant water damage to

the east wall of the garage, requiring the wall to be replaced. Sellers initially placed the house on the market on March 13, 2013. In preparation for selling the house, Sellers made some aesthetic improvements to the interior. One such improvement, according to Sellers testimony at trial, was the installation of a 1x8 board across the bottom of the east wall of the garage. According to Sellers, there was a small hole near the bottom of the wall that needed to be covered, but instead of filling the hole, they elected to cover the hole with the board, reasoning that installing the board would be easier.

Moreover, in conjunction with listing their house, Sellers filled out a Tennessee Residential Property Disclosure Form, pursuant to the Tennessee Residential Property Disclosure Act ("TRPDA").[1] On the disclosure form, Sellers marked "no" to whether any "[f]looding, drainage, or grading problems" existed and marked "yes" to whether they were aware of "any past or present water intrusions," explaining that the water intrusion was a "[o]ne time event" and that "heavy rain caused water to come into back laundry area—repairs made and drainage repaired—never had any other problems."[2] However, they did not disclose any other water intrusions, despite having other issues with water entering the house in the past. Specifically, water leaked into the garage multiple times until a French drain was installed in 2010 to alleviate the problem.

Three days after listing the house, on March 16, 2013, Purchasers made an initial offer of $230,000 plus requiring Sellers to pay up to $6,900 of the closing costs. Sellers countered with $232,500 and up to $5,000 of the closing costs, which Purchasers accepted.

Afterwards, as allowed by the Purchase and Sale Agreement, Purchasers hired a licensed home inspector, Jason Lovelace, to inspect the house. In his report, Mr. Lovelace noted several potential issues with the house. First, Mr. Lovelace indicated in his report that there was a "possible rainwater intrusion at the east wall in the garage[,]" as well as raising concerns that "a 1x8 board [was] installed along the base of the east wall in the garage for some unknown reason." In addition, Mr. Lovelace also noted that "[t]he grade along the east side of the garage/ utility room slopes towards the structure [but] should slope away from the structure for proper drainage. The grade may possibly be above the height of the slab."

---

[1] Section 66-5-202 of the Tennessee Code states that "the owner of the residential property shall furnish to a purchaser . . . [a] residential property disclosure statement in the form provided in this part regarding the condition of the property, including any material defects known to the owner." Tenn. Code Ann. § 66-5-202(1).

[2] The one-time event occurred during a rainstorm when water entered through a hole in a room at the back of the east wall. After finding water in the floor, the Follises discovered debris in one of their drains outside and removed it, stopping the water from overflowing into the house. Mr. Follis later caulked the hole, fixing the issue.

As a result of the inspection report, Purchasers became concerned about rainwater entering the garage, as well as the reason for the placement of the board along the bottom of the wall. To alleviate their concerns, Sellers' real estate agent sent an email with attached photographs taken by Sellers of the garage after it rained, stating: "Attached are photos just taken by the owners during the rain. . . . You can see there is no water issue in the garage. The [Sellers] have no reason to believe there is a problem or issue with the wood trim being in the garage. . . . As a result . . ., the seller has no reason or desire to remove the wood trim in the garage." Sellers' agent also relayed that Sellers were attempting to locate all invoices for "work done regarding the drainage."[3] Purchasers' real estate agent responded by stating the following:

> I'm attaching the entire inspection report. The buyers don't plan to ask for every item to be addressed, so we were trying not to upset the sellers by showing them the entire report, but the buyer has asked me to show it to you to possibly clarify things.
>
> . . . .
>
> No one is trying to be an alarmist, we all know that wood can't be touching the ground, and it is touching the ground at the southeast corner of the garage. We don't necessarily think that water is gushing into the garage, we're afraid that water is seeping under the wall and possibly deteriorating the plate and maybe causing some deterioration to the interior wall in the garage. We thought that possibly seeing behind that 1x8 would help us see inside the wall. Thank you for the pictures you forwarded.

In response, Sellers' agent offered the following explanation for the 1x8 on the east wall of the garage:

> As to the wood trim. When the seller had the drainage issues fixed they did not like how the drywall and the garage floor came together. The repair guy told the sellers a piece of trim would make it look "prettier." That is why the piece of wood is in the garage along the floor. It's purely cosmetic in nature. Having said that, they don't want to take out the board and then have to deal with the drywall and replacing the board.

As a result of the email exchange, Purchasers decided not to inspect the walls further, but due to the possible rainwater intrusion and grading issue, Sellers agreed to pay an additional $1,500 of the closing costs, amounting to a total of $6,500. Purchasers

---

[3] The invoices were never sent to Purchasers. Instead, a proposal for work to the house was attached to the email. The proposal related to the "one time event" in the room at the back of the east wall.

executed this agreement in lieu of three separate remedies available to them under the Purchase and Sale Agreement. Under section 8(D) of the Purchase and Sale Agreement, Purchasers were permitted to exercise the following remedies: (1) "furnish Seller with a list of specified objections and immediately terminate" the contract; (2) "accept the [house] in its present 'AS IS' condition[;]" or (3) "furnish Seller a written list of items which Buyer requires to be repaired and/or replaced with like quality or value in a professional and workmanlike manner." Moreover, under the third remedy, Purchasers had the "right to request any supporting documentation that substantiates any item listed." The closing took place on April 16, 2013. Purchasers did not conduct a final inspection before closing, as allowed by the Purchase and Sale Agreement.[4]

Two days after the closing, on April 18, 2013, Purchasers took possession of the house. Later that same day, they noticed water leaking into the house through the east wall of the garage. Concerned, they hired an inspector, Gauge Moorefield, to assess any possible repairs that needed to be made. After removing the 1x8 boards from the wall, Mr. Moorefield discovered severe water damage, finding that the wall had been exposed to moisture over an extensive period of time.[5] Moreover, the inspector testified that the water damage to the sheetrock was obvious, stating that during his inspection "it became evident that they used [the 1x8 board] because they were covering up a large exposed gap which showed [] a rotten wall" and "whoever put that board up, they had to have seen what they were covering up." After Mr. Moorefield's assessment, Purchasers spent $13,100 repairing the wall.

Purchasers filed suit in the General Sessions Court for Shelby County, Tennessee, on June 3, 2013. The judgment of the general sessions court was subsequently appealed

---

[4] Regarding a final inspection, the agreement provided:

> Buyer and/or his inspectors/representatives shall have the right to conduct a final inspection of Property no later than 1 day[ ] prior to the Closing Date only to confirm Property is in the same or better condition as it was on the Binding Agreement Date, normal wear and tear excepted, and to determine that all repairs/replacements agreed to during the Resolution Period, if any, have been completed. Property shall remain in such condition until the Closing at Seller's expense. Closing of this sale constitutes acceptance of Property in its condition as of the time of Closing, unless otherwise noted in writing.

Here, this inspection would have been limited to "confirm [the house was] in the same or better condition as it was" when the Purchase and Sale Agreement was executed because Purchasers decided to contract for $1,500 towards closing costs instead of electing the third remedy provided for in the contract.

[5] The water damage was a result, according to Mr. Moorefield, of the garage originally being a carport. Normally, in the construction of a garage, a concrete curb is erected at the bottom of a wall in order to ensure water does not touch wood. However, in this garage, there was no concrete curb, and the grading of the ground sloped towards the house, causing the wood to routinely come into contact with water and rot.

to the circuit court where Purchasers filed an amended complaint, alleging, among other things, fraud, fraudulent concealment, and fraudulent inducement, as well as violations of the TRPDA. Purchasers also sought punitive damages. Sellers denied each of these claims in their answer. Moreover, Sellers asserted as an affirmative defense that Purchasers were on notice of the water intrusion and damage when executing the contract.

A bench trial was eventually held on February 22, 2017, and February 23, 2017. After trial, the court found that Purchasers met their burden of proof regarding their claims of fraud, fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement. Specifically, the court found that there were two instances where the water damage was concealed: (1) the disclosure form; and (2) the failure to disclose the water damage after Mr. Lovelace's inspection report. The court also found that the boards were placed along the wall to cover the water damage, not to cover the hole or for aesthetic purposes, as Sellers testified. The trial court awarded $13,100 in compensatory damages, representing the cost to repair the wall. At a separate punitive damages hearing, the court found that Sellers' conduct was egregious and set another trial to determine the amount of punitive damages that should be awarded. After the punitive damages trial, on November 17, 2017, the court determined that Purchasers were entitled to $39,300 in punitive damages. Sellers filed a timely notice of appeal.

## II. ISSUES PRESENTED

Although not exactly worded as such, Sellers present the following issues on appeal:

1. Whether the trial court erred in ruling in favor of Sellers "on their claims of fraudulent inducement, fraudulent misrepresentation, fraudulent concealment and damages under the [TRPDA] because they were on notice of a potential defect and elected to proceed with the transaction."[6]
2. Whether the trial court erred in awarding punitive damages.

## III. STANDARD OF REVIEW

Because this case was tried without a jury, we will review findings of fact de novo, with a presumption of correctness. *Holland v. Forrester,* No. E2016-02147-COA-R3-CV, 2017 WL 6405111, at *3 (Tenn. Ct. App. Dec. 15, 2017). However, "[o]ur *de novo* review is tempered by the well-established rule that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such credibility

---

[6] Sellers raised a third issue—"Whether [Purchasers] are bound by the removal of the inspection contingency in a residential Purchase and Sale Agreement through a negotiated agreement for a reduction in price and consummating the sale after they were on notice that there was potential water intrusion . . . ." We address this issue in conjunction with the first issue, as both issues address whether Buyers had notice of the defective condition of the wall.

determinations are entitled to great weight on appeal." *Pitz v Woodruff*, No. M2003-01849-COA-R3-CV, 2004 WL 2951979, at *7 (Tenn. Ct. App. Dec. 17, 2004) (quoting *Murvin v. Cofer*, 968 S.W.2d 304, 306 (Tenn. Ct. App. 1997)) (internal quotation marks omitted). We review the trial court's findings of law de novo, with no presumption of correctness. *Id.*

## IV. DISCUSSION

### *A.*

On appeal, Sellers argue that the trial court erred in finding they were liable for fraud, fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement. At the onset, we note that fraud and fraudulent misrepresentation are the same cause of action. *Concrete Spaces, Inc. v. Sender,* 2 S.W.3d 901, 904 n.1 (Tenn. 1999) (stating that intentional misrepresentation, fraudulent misrepresentation, and fraud are synonymous); *Huddleston v. Harper,* No. E2014-01174-COA-R3-CV, 2015 WL 3964791, at *4 (Tenn. Ct. App. June 30, 2015) ("'[I]ntentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action."). The court in *Huddleston* suggested that the term "intentional misrepresentation" be used exclusively to denote fraud, fraudulent misrepresentation, and intentional misrepresentation; therefore, we will refer to both the fraud and fraudulent misrepresentation claims as intentional misrepresentation. *Huddleston,* 2015 WL 3964791, at *4 ("[W]e will refer to the cause of action as a claim for intentional misrepresentation, and, in order to avoid confusion, we suggest that this term should be used exclusively henceforth.").

In order to prove intentional misrepresentation, a plaintiff must show the following:

> 1) the defendant made a representation of an existing or past fact; 2) the representation was false when made; 3) the representation was in regard to a material fact; 4) the false representation was made either knowingly or without belief in its truth or recklessly; 5) plaintiff reasonably relied on the misrepresented material fact; 6) plaintiff suffered damage as a result of the misrepresentation.

*Goodall v. Akers,* No. M2008-01608-COA-R3-CV, 2009 WL 528784, at *5-6 (Tenn. Ct. App. Mar. 3, 2009) (quoting *Walker v. Sunrise Pontiac-GMC Truck, Inc.,* 249 S.W.3d 301, 311 (Tenn. 2008)).

Purchasers also brought a fraudulent inducement claim. A claim for fraudulent inducement is closely associated with an intentional misrepresentation claim, as "[i]t arises when a person's willingness to enter into a contract is caused by another person's

[intentional] misrepresentations with regard to a matter material to the contract." *Loew v. Gulf Coast Dev., Inc.*, 01-A-019010CH00374, 1991 WL 220576, at \*7 (Tenn. Ct. App. Nov. 1, 1991).  In order to bring a successful fraudulent inducement claim, a plaintiff must prove that the defendant "(1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied upon, and (5) an injury resulted from this reliance." *Baugh v. Novak,* 340 S.W.3d 372, 388 (Tenn. 2011).

Moreover, a party is liable to the same extent for concealing a material fact as a party is liable for intentional misrepresentation.  *Patel v. Bayliff,* 121 S.W.3d 347, 352-53 (Tenn. Ct. App. 2003) (quoting *Macon Cty. Livestock Mkt. Inc. v. Ky. State Bank, Inc.*, 724 S.W.2d 343, 349 (Tenn. Ct. App. 1986)).  "A party commits fraudulent concealment for failing to disclose a known fact or condition where he had a duty to disclose and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury."  *Dixon v. Chrisco,* No. M2018-00132-COA-R3-CV, 2018 WL 4275535, at \*4 (Tenn. Ct. App. Sept. 7, 2018) (quoting *Odom v. Oliver,* 310 S.W.3d 344, 349 (Tenn. Ct. App. 2009) (internal quotation marks omitted).  In order to establish a fraudulent concealment claim, a party must show "(1) the defendant had knowledge of a material existing fact or condition, and that (2) the defendant had a duty to disclose the fact or condition."  *Id.* (quoting *Pitz,* 2004 WL 2951979, at \*8).  A fact is material where it is "'of controlling importance in determining the desirability and value of the residence' that would not be apparent to the buyer through the exercise of ordinary diligence."  *Patel,* 121 S.W.3d at 353 (quoting *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947)).  "[T]here is no duty to disclose a material fact or condition if it was apparent through 'common observation' or if it would have been discoverable through the exercise of ordinary diligence."  *Pitz*, 2004 WL 2951979, at \*8 (citing *Simmons*, 206 S.W.2d at 297).

First, we note the trial court determined that the testimony of Sellers was not credible, finding that Sellers knew of the condition of the east wall and used the 1x8 board to conceal the water damage.  "When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues."  *Mach. Sales Co., Inc. v. Diamondcut Forestry Prod., LLC,* 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002).  "Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."  *Hanger Prosthetics & Orthotics E., Inc. v. Kitchens,* 280 S.W.3d 192, 199 (Tenn. Ct. App. 2008).  There is not clear and convincing evidence to contradict the trial court's finding that Sellers were not credible.

Because the trial court found that Sellers' testimony concerning their unawareness of the water damage was not credible, this case turns on whether Purchasers reasonably

relied on Sellers' misrepresentations and concealment of the water damage. The trial court found that Purchasers relied on the misrepresentations in the disclosure form and were prohibited from discovering any defects or making further inspections by Sellers. The trial court further stated this reliance was reasonable, as Purchasers "wanted to further investigate" but were denied their requests to see underneath the board and were sent pictures taken by Sellers to show there was no water entering the house through the east wall.

Reasonable reliance is a question of fact. *Pitz*, 2004 WL 2951979, at *10. To determine whether there was reasonable reliance, we consider the following factors:

> (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation.

*Id.* Here, while we agree that there was concealment, there was also an opportunity to discover the fraud through the exercise of ordinary diligence and through available relevant information.

"It is well settled that if a purchaser of real property has notice or with ordinary diligence should have had notice of a problem with the real estate, the purchaser cannot attack the validity of the contract for fraud, misrepresentation, or concealment of that problem." *Daniels v. Basch,* No. M2004-01844-COA-R3-CV, 2005 WL 2860177, at *5 (Tenn. Ct. App. Oct. 27, 2005) (citing *Winstead v. First Tennessee Bank N.A., Memphis*, 709 S.W.2d 627, 631 (Tenn. Ct. App. 1986)). Purchasers were put on notice of potential defects by Mr. Lovelace's inspection report. The report detailed (1) a possible water intrusion on the east wall; (2) grading issues outside the east wall; and (3) the presence of a 1x8 board across the wall for an unknown reason. Moreover, the report also warned in all capital letters that "all items [noted] should be further investigated by the appropriate professionals in their field of expertise and repairs made as needed." Despite the listed potential issues and warning, Purchasers failed to conduct any further inspections.

Not only did the inspection report put Purchasers on notice of issues relating to the east wall, but they also had the ability to remedy the issues under the Purchase and Sale Agreement. The contract provided that after the inspection, Purchasers "could furnish Seller a written list of items which Buyer requires to be repaired and/or replaced with like quality or value in a professional and workmanlike manner." If a list of items to be repaired or replaced had been furnished, Purchasers would then have "the right to request any supporting documentation that substantiates any item listed." Purchasers also had the

option to conduct a final inspection of the property under the contract[7] but elected not to exercise this right. "Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within its reach." *Solomon v. First Am. Nat'l Bank of Nashville,* 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989). The means of knowledge were easily accessible to Purchasers had they exercised their contractual remedy to fix any issues related to water intrusion in the east wall. In addition, Purchasers decided to negotiate for an additional $1,500 to be paid towards closing costs by the Seller. This counter-offer was made due to concerns over the grading outside the east wall, evidencing Purchasers were on "notice of a problem with the real estate[,]" yet proceeded to purchase the property irrespective of their concerns.

Therefore, Purchasers did not reasonably rely on Sellers' misrepresentations and concealment, as they could have discovered the fraud through ordinary diligence by pursuing the remedy under the Purchase and Sale Agreement, which also would have provided them access to relevant information regarding the condition of the wall. Moreover, Purchasers were on notice of a problem with the house, as evidenced by the inspection report and their counter-offer for an additional $1,500 towards closing costs, further showing their reliance on Sellers' misrepresentations was unreasonable.

Reasonable reliance is an essential element for intentional misrepresentation, fraudulent inducement, and fraudulent concealment. *See Baugh,* 340 S.W.3d at 388 (listing that "the statement was reasonably relied upon" as the fourth element of fraudulent inducement); *Goodall,* 2009 WL 528784, at *6 ("[Reasonable] reliance is an essential element of a claim for fraudulent misrepresentation or fraudulent concealment."); *Williams v. Berube & Assocs.,* 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000) ("An essential requirement of any action for fraud, deceit, failure to disclose or negligent or innocent misrepresentations is detrimental reliance on a false premise"). Due to the Purchasers' notice of potential defects and failure to exercise ordinary diligence, the evidence preponderates against the trial court's finding of reasonable reliance.

### *B.*

Sellers also argue on appeal that the trial court erred in awarding punitive damages to Purchasers. Because we have already concluded that Purchasers unreasonably relied on Sellers' misrepresentations, this issue is pretermitted.

---

[7] *See* supra note 4.

## V. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby reversed and remanded for dismissal of the case. Costs of this appeal are taxed to the appellees, Kenneth Fulmer and Debra Fulmer, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE